UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MUNAWAR ALI, | ) |
|       Plaintiff, | ) |
| v. | ) No. 17 C 4025 |
| SOHAIL KHAN, | ) Judge Rebecca R. Pallmeyer |
|       Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Munawar Ali, a Pakistani immigrant, filed this suit against his former employer and business partner, Defendant Sohail Khan, claiming that Khan subjected Ali to involuntary servitude and human trafficking at various points between 2003 and 2007. Ali alleges, among other things, that Khan forced him to live at Khan's residence and to provide domestic services to Khan's family by confiscating Ali's passport and threatening to report Ali's unlawful presence in the United States to federal immigration authorities. Khan has filed a motion to dismiss [25]. For the reasons explained below, Khan's motion is denied.

## BACKGROUND

Plaintiff's allegations are presumed true for purposes of this motion. *See Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016).

Plaintiff Munawar Ali resides in Marion County, Indiana. (Am. Compl. ¶ 1.) Defendant Sohail Khan resides in Cook County, Illinois. (*Id.* at ¶ 2.) Plaintiff Ali emigrated to the United States from Pakistan in 2001. (*Id.* at ¶ 4.) Neither the circumstances of his entry nor his activities upon arrival are disclosed in the complaint, but Ali alleges that in 2003, Defendant Khan hired him to work at a gas station located somewhere in Illinois. (*Id.* at ¶ 7.) At the time, and continuing for at least some years thereafter, Ali lacked "legal immigration status." (*Id.*) At some point after 2003, Khan began to "wrongfully withh[o]ld" some or all of Ali's wages. (*Id.* at ¶ 8.) For several months in 2005 and 2006, Ali lived and slept at the Illinois gas station. (*Id.* at ¶ 13.)

Between 2005 and 2007, Khan "had possession" of Ali's "passport and other immigration documents." (*Id.* at ¶ 10.) Ali does not say how Khan obtained the documents, nor has he explained when or how Ali was able to retrieve them. Ali does allege that he asked Khan to return his passport and immigration documents on "multiple occasions," but Khan refused. (*Id.* at ¶ 11.) Ali alleges, further, that on unidentified dates, he "made several attempts to resign" from his position at the Illinois gas station, and that he asked Khan "repeatedly" for permission to move out of the gas station and to "get his own residence." (*Id.* at ¶ 12.) Khan denied these requests, and Ali continued working at the gas station "because Mr. Khan refused to pay Mr. Ali his back wages and/or return his passport and immigration documents." (*Id.* at ¶¶ 12, 14.)

In either 2006 or 2007, Ali alleges, Khan "forced" him to move out of the gas station and into Khan's own residence. (*Id.* at ¶ 15.) While living there, Ali performed housekeeping services for Khan's family—including cooking, cleaning, lawncare, and laundry—for which he was not paid, while also working "extremely long hours" at the gas station. (*Id.* at ¶¶ 16, 18.) Ali attempted to move out of Khan's home at several points prior to June 2007, though he does not say exactly how many attempts he made, or when any of them occurred. Khan thwarted each of these attempts by "verbally abusing" Ali, "threatening to call immigration services," and "threatening to not pay" Ali approximately $100,000 in unpaid wages. (*Id.* at ¶¶ 9, 20.) At some point, Ali nevertheless chose to ignore the threats; as of June 2007, he moved out of Khan's residence. (*Id.* at ¶ 21.) It appears that Ali stopped working at the Illinois gas station around this time, as well, though the Amended Complaint is not clear on this point either.

In October 2007, Khan offered Ali "the opportunity to become a fourteen percent (14%) equity partner" in a business that operated another gas station—this one located somewhere on 38th Street in Indianapolis, Indiana. (*Id.* at ¶ 23.) Despite his negative experience working for Khan in the past, Ali accepted this offer and began working at the 38th Street gas station. (*Id.* at ¶ 24.) He did so, he alleges, because he feared "(1) losing his unpaid wages and having to leave the United States without any money; (2) not receiving his passport and immigration documents;

2

and (3) Mr. Khan retaliating and calling immigration services which could lead to his deportation." (*Id.* at ¶ 24.)

It appears that Ali and Khan's "equity partnership" was not particularly equitable. In either 2007 or 2008, Khan informed Ali "that all profits generated from [the Indianapolis gas station] would be used to pay off an inventory loan." (*Id.* at ¶ 27.) In 2009, the 38th Street gas station turned a profit of between twelve and eighteen thousand dollars per month, but Ali did not "receive[ ] his full share" of these profits. (*Id.*) He did, however, manage to accumulate $67,000 in cash (he does not say how), which he stored in two safes—one at the 38th Street gas station and the other at another (unidentified) gas station owned by Khan. (*Id.*) At some point in 2012, Khan "directed" an unidentified "agent" to take this cash. (*Id.*)

In July 2013, Khan "offer[ed]" to convert Ali's ownership interest in the 38th Street gas station into an ownership interest in yet another gas station, located somewhere on 42nd Street in Indianapolis. (*Id.* at ¶ 27.) Ali "felt coerced," so he "accept[ed]" this "offer." (*Id.*) He "never received his full share of the profits generated" by the 42nd Street gas station, and, at some point, Khan "fired" Ali from a position Ali held as an employee of that gas station. (*Id.* at ¶¶ 27, 29.) In May 2016, the 42nd Street gas station "was sold," but Ali received no notice of the sale, nor did he recover any proceeds from it. (*Id.* at ¶ 27.)

Approximately one year later, on May 26, 2017, Ali filed this lawsuit, alleging that Khan held him in involuntary servitude in violation of 18 U.S.C. § 1584; obtained his labor and services by force, in violation of 18 U.S.C. § 1589; and engaged in human trafficking in violation of 18 U.S.C. § 1590. (*See* Compl. [1], at ¶¶ 38-47.) The court dismissed the original complaint for failure to state a claim (*see* Minute Entry of Sept. 15, 2017 [22]), and Ali filed an Amended Complaint [23] on October 16, 2017. Khan's motion to dismiss [25] the Amended Complaint is now before the court.

**DISCUSSION**

**I.      Involuntary servitude, forced labor, and human trafficking**

The Trafficking Victims Protection Reauthorization Act of 2003 established, among other things, a private cause of action for victims of involuntary servitude, forced labor, and various other criminal offenses listed in Chapter 77 of Title 18.  *See* Pub. L. No. 108-193 § 4(a)(4)(A); 18 U.S.C. § 1595(a).  The provisions of the Act that are relevant to this lawsuit are located at 18 U.S.C. §§ 1584, 1589, and 1590.  Section 1584 is derived from the Slave Trade statute of 1818 and the Padrone statute of 1874; it prohibits holding or selling any person into involuntary servitude.  *See United States v. Kozminski*, 487 U.S. 931, 944-46 (1988).  The phrase "involuntary servitude" is defined elsewhere in the United States Code as "a condition of servitude induced by means of (A) any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such a condition, that person or another person would suffer serious harm or physical restraint; or (B) the abuse or threatened abuse of the legal process."  22 U.S.C § 7102(6).

Congress enacted sections 1589 and 1590 as part of the Trafficking Victims Protection Act (TVPA) of 2000, Pub. L. No. 106-386, Div. A, § 112(a)(2).  Section 1589 creates a civil action against a person who "obtains the labor or services of a person . . . (1) by means of force, threats, of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."  18 U.S.C. § 1589(a).   The term "serious harm" means "any harm, whether physical or nonphysical . . . that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."  *Id.* at § 1589(c)(2).

The term "abuse or threatened abuse of the legal process" means "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." *Id.* at § 1589(c)(1).

Finally, Section 1590 makes it unlawful to "knowingly recruit[ ], harbor[ ], transport[ ], provide[ ], or obtain[ ] by an means, any person for labor or services in violation of this chapter." 18 U.S.C. § 1590(a). Ali has invoked each of these provisions in support of his complaint against Khan.

## II. Pleading Standards

Rule 8 requires that a complaint contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). This rule "does not require detailed factual allegations[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It does, however, require "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Nor are facts that suggest only a "speculative" claim to relief sufficient to state a claim. *West Bend Mutual Insurance Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016). Rather, the facts alleged in the complaint, when accepted as true and construed in the light most favorable to the non-moving party, must "give enough details about the subject-matter of the case to present a story that holds together." *Id.*

Defendant Khan suggests that the Amended Complaint falls short in several respects. He first argues that the forms of coercion to which Ali claims to have been subjected were not severe enough to state a claim for involuntary servitude or forced labor under 18 U.S.C. §§ 1584 or 1589. Defendant then suggests that the Amended Complaint does not state a claim under 18 U.S.C. § 1590 because it does not include any allegations of human trafficking. Finally, Defendant argues, even if Khan's allegedly coercive actions *were* sufficient to trigger liability under these

5

statutes, Ali's claims are barred by the ten-year statute of limitations in 18 U.S.C. § 1595(c). The court considers these arguments in turn.

## III. Analysis of Ali's Allegations

In this case, Ali argues that Khan's threat to "call immigration services" amounts to an allegation that Defendant obtained Plaintiff's labor or services by threatening "serious harm" and/or "abuse of the legal process." In Ali's view, the allegation is sufficient on its own to state a claim under sections 1584 (which prohibits holding a person to involuntary servitude), 1589 (which prohibits obtaining labor or services by force or threats), and 1590 (which prohibits trafficking). With respect to the trafficking claim, Khan points out that the Amended Complaint does not say anything about the circumstances in which Ali first came to the United States in 2001—two years before he began working for Khan. It does not include any allegations that Khan recruited Ali to come to the United States, transported Ali or paid for his transportation (or promised to do so), or otherwise induced Ali to travel to the United States—or even to Illinois or Indiana from some another state. There are, in short, no allegations that Khan recruited or otherwise obtained Ali's person for labor or services, as the text of section 1590 requires. *See Franco v. Diaz*, 51 F. Supp. 3d 235, 247 (E.D.N.Y. 2014). The court agrees with Khan that Ali's allegations are insufficient to establish a violation of § 1590.

Ali's allegations that Khan violated §§ 1584 and 1589 have greater traction. At least one other court has concluded that "[t]he threat of deportation alone may support a claim for forced labor." *Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 444 (E.D.N.Y, 2013). Several others—including the Seventh Circuit—have found that a defendant's threat to report an individual's immigration violations was sufficiently coercive to trigger liability, where the threat was made in conjunction with other methods of coercion such as verbal abuse, physical abuse, social isolation, or the confiscation of the plaintiff's passport. *See, e.g.*, *United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008); *Franco,* 51 F. Supp. 3d 235; *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107 (D.D.C. 2012); *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134 (C.D. Cal.

2011); *Ramos v. Hoyle*, No. 08-21809-CIV, 2008 WL 5381821 (S.D. Fla. Dec. 19, 2008); *United States v. Garcia*, No. 02-CR-110S-01, 2003 WL 22938040 (W.D.N.Y. Dec. 2, 2003). As the Seventh Circuit explained in *Calimlim*, even "vague warnings that someone might report" an immigrant whose lawful presence in the United States depended on her employment "could reasonably be viewed as a scheme to make [that plaintiff] believe that she or her family would be harmed if she tried to leave." *Calimlim*, 538 F.3d at 713. Such a scheme, the court noted, was "all the jury needed to convict" the defendant under section 1589. *Id.*

Defendant argues that each of these cases is distinguishable from Ali's, either because the defendant recruited the plaintiff to come to the United States in the first place—which Ali has not alleged—or because the plaintiffs were uniquely vulnerable to coercion for some other reason, such as their young age and/or lack of English skills. Neither argument is persuasive. As noted above, sections 1584 and 1589 are aimed at involuntary servitude and coerced labor, and neither requires a defendant to have induced the plaintiff to travel as a prerequisite for liability. Nor do they require that a plaintiff be uniquely vulnerable in ways other than a lack of legal immigration status. Indeed, as the Sixth Circuit recently noted, the exploitation of "foreign-born" persons is precisely what gives rise to most prosecutions under section1589. *United States v. Callahan*, 801 F.3d 606, 618 (6th Cir. 2015).

Defendant analogizes this case to *Muchira v. Al-Rawaf*, 850 F.3d 605 (4th Cir.), *cert. denied* 138 S.Ct. 448 (2017), where the Fourth Circuit stated that "Section 1589 intended to address *serious* trafficking," and found that an immigrant plaintiff's unfounded belief that "Saudi cultural 'house rules' applied in the United States" was not enough to support her claim that the family for whom she performed domestic services forced her to perform those services by threats of serious harm and abuse of the legal process. *Id.* at 618. *Muchira* was decided after consideration of a full record at summary judgment. It provides only limited guidance for the question of whether Ali's allegations are sufficient to state a claim for relief. And that guidance does not obviously dictate dismissal of Ali's complaint. The *Muchira* court noted that the plaintiff

7

in that case had come to the United States willingly. *Id.* at 619. She was literate in English and was not physically abused or threatened with physical harm if she failed to meet the family's expectations. *Id.* Nor was she physically restrained or impeded from leaving her apartment, or prevented from communicating with other persons. *Id.* Indeed, she "exchanged approximately 15,000 public and private messages [on social media] with family and friends during the eight months she worked for" the defendants. *Id.* at 611. A reasonable person in Muchira's circumstances, the court concluded, would not have felt compelled "to remain in the Saudi family's employ, against her will . . . when she otherwise would have left." *Id.* at 629.

There are some obvious similarities between those circumstances and Ali's: both plaintiffs were able to communicate in English, for example, and neither was physically abused or subjected to extreme isolation. But there are differences as well. The defendants in *Muchira* did not explicitly threaten the plaintiff with deportation. Unlike Ali, Muchira "was at all times legally present" in the United States. *Id.* at 623. Although her employers did possess her passport while she worked for them, Muchira did not present any evidence that they intentionally withheld or seized the passport as a means of thwarting Muchira's attempts to end her employment. "Muchira may well have been legitimately anxious or fearful" about her ability to remain in the United States, the Fourth Circuit explained, but "that pressure was not brought to bear by [the defendants]." *Id.* at 624. The law "distinguish[es] between improper threats or coercion and permissible warnings of adverse but legitimate consequences." *Id.* (citation and quotation marks omitted).

Ali has alleged that Khan "threatened to call immigration services" if Ali refused to perform domestic services at Khan's home, that Ali lacked "a legal immigration status" at the time of this threat, and that Ali feared that such a call "could lead to Ali's deportation." (Am. Compl. ¶¶ 4, 7, 20, 24.) True, these allegations are disappointingly vague—they provide few details about what, exactly, Khan said or when, exactly, he said it, and identify no details about other circumstances of Ali's life that might show his susceptibility (or lack thereof) to Khan's exploitation. The complaint is notably silent on the question of what changed between May 2007, when Khan's threats were

8

coercive enough to keep Ali in a condition of involuntary servitude, and June 2007, when those threats apparently lost their coercive power over Ali. Nor does Ali's complaint say how he managed to accumulate $67,000 in cash if Khan was not paying him for his labor.

Puzzling as these gaps in Ali's story may be, this case is governed by the plausibility pleading standard in Rule 8, not the heightened pleading standard in Rule 9. Ali's immigration-related allegations "give enough detail about the subject-matter of the case to present a story that holds together," *Schumacher*, 844 F.3d at 675. Khan's alleged threat to report Ali to "immigration authorities," while vague, sounds enough like an "improper threat[ ] or coercion" (and not a mere "warning[ ] of adverse but legitimate consequences") to allow Ali to proceed with his claims for forced labor and involuntary servitude. Khan did not simply inform Ali that Ali's immigration status might change if he stopped working for Khan. Ali has plausibly alleged not only that he lacked legal status, but also that Khan knew (or at least suspected) this, and that Khan threatened to report Ali's immigration violation(s) to "immigration authorities" if Ali refused to continue providing Khan with domestic services.

The fact that Khan's threat ultimately proved insufficient to prevent Ali from leaving Khan's home is relevant, as Defendant suggests, but it is not dispositive of Ali's claims. Unlike in *Headley v. Church of Scientology*, where the summary judgment record showed both plaintiffs had succeeded in leaving their employment "the first time either tried to do so," 687 F.3d 1173, 1177 (9th Cir. 2012), Ali alleges that he tried to stop work for Khan on multiple occasions, and that several of these attempts were thwarted by Khan's threat (or threats). (*See* Am. Compl. ¶¶ 16-20.)

Nor is it dispositive that Ali decided to continue his business relationship with Khan after moving out of Khan's home. Ali's willingness to do gasoline-related business with Khan between 2007 and 2013 is curious, but does not require a conclusion that his earlier decisions to provide Khan with domestic services were voluntary. In any event, Ali alleges that he only agreed to continue doing business with Khan because he continued to believe that Khan would follow

9

through on his threats if Ali refused. Although Ali may ultimately be unable to prove this allegation—he appears to have defied Khan's wishes only a few months earlier, without incurring any discernible consequences—it is not wholly implausible, either. The alleged threats in Ali's Amended Complaint are sufficient to state a claim for relief under section 1584 and/or 1589—provided the claim is not barred by the statute of limitations.

## IV.     Statute of limitations

15 U.S.C. § 1595(c) establishes a ten-year statute of limitations on private actions for relief under sections 1584, 1589, and 1590 (among other provisions in Title 18). "Generally, a claim accrues when all its elements have come into existence." *Cathedral of Joy Baptist Church v. Village of Hazel* Crest, 22 F.3d 713, 717 (7th Cir. 1994). Although the statute of limitations is an affirmative defense, "a district court may dismiss under Rule 12(b)(6) something that is indisputably time-barred." *Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005).

Plaintiff's claims are not indisputably time-barred in this case. Although Ali did not file this action until May 26, 2017, and at least some of Khan's alleged unlawful conduct occurred more than ten years prior to that date, Ali continued living at Khan's residence and providing Khan and Khan's family with domestic services until some point in June 2007. Moreover, the Amended Complaint suggests, albeit somewhat obliquely, that Khan continued to issue threats even after Ali's "escape" from Khan's residence in June 2007. (*See* Am. Compl. ¶ 26 ("None of those circumstances ever changed after June 2007.").) Construing the Amended Complaint in the light most favorable to Ali, as the court must, he has alleged that Khan continued to issue threats to him after May 26, 2007, and that Ali remained in a condition of involuntary servitude because of those threats for at least some period of time within ten years of the date he filed his Complaint. In situations like this, where a plaintiff's injury arises from a "numerous and continuous series of events" that extends into the statutory period, *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001), the "continuing violation" doctrine permits a plaintiff "to reach back to the beginning of a

claim even if that beginning lies outside of the statutory period." *Macklin v. United States*, 300 F.3d 814, 824 (7th Cir. 2002) (citation and quotation marks omitted).

## **CONCLUSION**

Because Plaintiff has stated a claim for relief under 18 U.S.C. §§ 1584 and 1589, Defendant's motion to dismiss [25] is denied.

ENTER:

Dated: August 21, 2018

_____
REBECCA R. PALLMEYER
United States District Judge

Case: 1:17-cv-04025 Document #: 37 Filed: 08/21/18 Page 11 of 11 PageID #:132